**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PATRICIA GILKEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 04 C 2833** |
| **v.** | ) | |
| | ) | **Mag. Judge Michael T. Mason** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Patricia Gilkey ("Gilkey"), filed a motion for summary judgment seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). The Commissioner denied Gilkey's claim for Disability Insurance Benefits under §§ 216(i) and 223 of the Social Security Act ("Act"), codified as 42 U.S.C. §§ 416(i) and 423(d). The Commissioner granted, in part, Gilkey's claim for Supplemental Security Income Benefits ("SSI") under § 1614(a)(3)(A) of the Act, codified as 42 U.S.C. § 1382c(a)(3)(A).[1] The Commissioner filed a cross-motion for summary judgment asking this Court to affirm the final decision of the Commissioner. We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Gilkey's motion is granted and the Commissioner's motion is denied. This matter is remanded for further proceedings consistent with this opinion.

---

[1] The Commissioner found that Gilkey has been "disabled" since March 6, 2000 under § 1614(a)(3)(A) of the Act.

**BACKGROUND**

**Procedural History**

Gilkey filed an application for disability insurance benefits and supplemental security income benefits on July 15, 1996. (R. at 235-42). In her application, she alleged an onset date of May 15, 1996. (R. at 235-42). Gilkey's claim was denied initially on November 13, 1996 and upon reconsideration on February 5, 1997. (R. at 116-20). Gilkey filed a timely request for hearing and on June 30, 1998, a hearing was held in front of Administrative Law Judge Irving Stillerman. (R. at 121). On October 9, 1998, ALJ Stillerman issued a written decision denying Gilkey benefits. (R. at 127).

Pursuant to an Appeals Council Order entered May 1, 2000, the decision was vacated and the matter remanded with instructions. (R. at 154-56). The Appeals Council remanded the case to an ALJ with instructions to: (1) obtain updated evidence concerning the claimant's residuals of right radical mastectomy and asthma, and (2) give further consideration to the treating and examining source opinions and the non-examining source opinions, and explain the weight given to such opinion evidence. (R. at 155). The Order also instructed the ALJ to obtain evidence from a medical expert to clarify the nature and severity of the claimant's impairments and to obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base. (R. at 155).

ALJ Robert T. Karmgard held hearings on September 13, 2001 and January 30, 2002. (R. at 31, 521). On January 31, 2003, ALJ Karmgard issued a written opinion denying Gilkey disability insurance benefits and granting SSI benefits beginning on March 6, 2000. (R. at 30). The Appeals Council denied Gilkey's request for review on March 5,

2004, and ALJ Karmgard's decision became the final decision of the Commissioner. *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Gilkey subsequently filed this action in the District Court. Gilkey claims that the ALJ erred in finding her not disabled between May 15, 1996 and March 5, 2000.

**Medical Evidence**[2]

Claimant has a history of breast cancer and underwent a modified right radical mastectomy in 1990. The records show follow up chemotherapy and on and off complaints of right upper extremity swelling and pain. In 1992, Gilkey complained of bilateral knee pain, greater on the left, but x-rays showed no significant abnormality. Records from the early 1990's show that Gilkey reported a history of asthma and sinusitis symptoms. Claimant was diagnosed with hypertension in July 1995.

On October 4, 1996, Dr. Stephen S. Epner performed a consultative examination on Gilkey. (R. at 323-26). The examination lasted one hour and Dr. Epner did not have medical data available for review prior to the examination. (R. at 323). He noted that Gilkey was 65" (5' 5") tall and weighed 244 pounds. (R. at 324). Dr. Epner noted that on physical examination, Gilkey had virtually no movement of the right hand and wrist. (R. at 325). He reported that she developed exquisite tenderness and weakness of the right arm and had extreme weakness in the right hand and wrist. (*Id.*). He further noted that Gilkey's right arm was significantly swollen and that even relatively light touch may cause pain of the right arm. (R. at 325-26). Circumference measurements revealed the extent of

---

[2] Claimant's significant medical history is discussed in detail in ALJ Karmgard's opinion. The Court has considered all of the evidence in the record. However, for the most part, this section is limited to background information and a summary of the medical evidence during the relevant time period at issue, May 15, 1996 through March 5, 2000.

Gilkey's right arm swelling. (R. at 325). Dr. Epner stated that Gilkey did not use her right arm for any purposeful function and that she could only abduct to 20° at the shoulder. (*Id.*). Dr. Epner also noted that claimant had 2+ edema to the knees bilaterally and a history of asthma. (R. at 325-26).

Dr. Earl W. Donelan performed a residual functional capacity ("RFC") assessment of Gilkey on October 30, 1996. (R. at 330-37). At the time, Gilkey was 65" (5' 5") tall and weighed 244 pounds. (R. at 331). Dr. Donelan opined that she could occasionally lift or carry a maximum of twenty pounds and could frequently lift or carry a maximum of ten pounds. (*Id.*). He noted that Gilkey could stand and/or walk a total of six hours in an eight-hour work day and could sit for a total of six hours in an eight-hour workday. (*Id.*). He also noted that she was not limited in pushing and/or pulling, but was limited in reaching, handling, fingering and feeling. (R. at 331, 333). He described Gilkey as having no effective use of the right upper extremity. (R. at 333). Finally, while Dr. Donelan indicated that Gilkey should avoid excessive pulmonary irritants, he also stated there was no frequent treatment noted for claimant's asthma. (R. at 332).[3]

On January 24, 1997, Gilkey underwent an oophoroecotmy/hysterectomy. In a February 10, 1997 treating physician report, Dr. J. Fuloria stated that claimant would be able to return to work six weeks after surgery. (R. at 327-29). Dr. Fuloria noted that activities like lifting, carrying and handling objects may need to be somewhat limited because of the lymphedema of the right arm. (R. at 329).

Dr. Thomas Gynn, Gilkey's treating physician, completed a residual functional

---

[3] Dr. Donelan's October 30, 1996 RFC assessment includes a signature by Dr. Ernst Bone dated February 14, 1997.

4

capacity questionnaire on July 8, 1998. (R. at 339-42). He noted a clinical finding of right arm lymphedema. (R. at 349). Dr. Gynn described Gilkey's symptoms as weakness and swelling in the right arm. (*Id.*). He found that Gilkey could sit and stand continuously for more than two hours at a time. (R. at 340). He opined that she could sit for four hours and stand or walk for four hours in an eight-hour workday. (R. at 341). Dr. Gynn also noted that Gilkey would need to take unscheduled breaks during an eight-hour workday. (R. at 341). Dr. Gynn reported that Gilkey had significant limitations with respect to repetitive reaching, handling and fingering. (R. at 341). Dr. Gynn concluded that out of an eight-hour workday, Gilkey could grasp, turn and twist objects with her right hand twenty-five percent of the time, she could engage in fine manipulation with the right fingers fifty percent of the time, and she could reach with the right arm twenty-five percent of the time. (R. at 342). Dr. Gynn also reported that Gilkey's impairments were reasonably consistent with the symptoms and functional limitations described in his evaluation. (R. at 340).

On November 11, 1998, Gilkey was hospitalized for over a month at St. Francis Hospital of Evanston for cellulitis of the right upper extremity. (R. at 369). The Discharge Summary notes that Gilkey is an obese 46-year-old African American female with a very swollen right upper extremity, status post right mastectomy. (R. at 369). The summary indicates that Gilkey's hypertension and asthma are very well controlled with medication. (*Id.*). The discharge instructions state that Gilkey was advised to spare the right arm from any activity, to elevate it and to use compression devices for swelling of the right upper arm after the cellulitis cleared. (R. at 370).

Dr. Gynn's records reflect on and off reports of pain, swelling and weakness in claimant's right arm and hand through December 1998. (R. at 344-347). On February 8,

5

1999, claimant complained of swelling and pain in the right hand. (R. at 349). The February 8, 1999 records show right upper extremity non-pitting edema and some tenderness in the metacarpal bones. (*Id.*).

A July 19, 1999 physical therapy report noted that Gilkey complained of increased right arm pain and occasional right shoulder pain. (R. at 364-368). The claimant reportedly elevated her arm to ease the pain. (R. at 364). The record indicates that Gilkey's present work status was two days per week. (*Id.*). Her reported limitations were inability to work more than two days per week and inability to lift heavy objects. (*Id.*). The record indicated decreased range of motion in the right shoulder and right arm swelling. (R. at 365). The claimant was fitted for a compression device, scheduled for physical therapy three times per week and ordered to undergo lymphatic drainage management, bandaging and exercise. (R. at 368). Follow up records indicate that a number of appointments were cancelled and only three treatments occurred. (R. at 352-354).

An October 19, 1999 physical therapy report indicates that Gilkey complained of right wrist pain and right arm swelling. (R. at 359-363). The report noted some swelling in the right arm, wrist and shoulder and some decreased range of motion in the right elbow, shoulder and wrist. (R. at 359-360). The report indicated that the claimant was working full time as a medical assistant. (R. at 359). However, the claimant indicated that she could not wear the compression bandages at work. (R. at 363). She reported being unable to pick up or lift "really heavy things." (R. at 359). Continuation of physical therapy and drainage management was recommended. (R. at 363).

On September 20, 2000, Dr. May Hashimi performed a consultative examination on Gilkey. (R. at 470-473). Dr. Hashimi reported significant right upper extremity swelling and

6

an inability to move the right shoulder, elbow, wrist and hand. (R. at 472). Dr. Hashimi noted restriction in fine and gross manipulations for the right upper extremity. (R. at 473). The report also noted decreased range of motion in the lumbar spine and left knee. (R. at 472). Dr. Hashimi prepared two residual functional capacity assessments on September 22, 2000. (R. at 474-484). The forms are inconsistent with respect to claimant's ability to perform postural activities and the need for alternation between sitting and standing. (*Id.*). However, both forms essentially note sedentary residual functional capacity with no ability to use the right arm. (*Id.*).

On August 8, 2001, Dr. Gynn completed another residual functional capacity questionnaire. (R. at 486-489). Dr. Gynn noted that claimant had difficultly lifting with the right arm and right arm weakness. (R. at 486). He also noted right arm edema. (*Id.*). While Dr. Gynn noted no limitations for duration of sitting or standing, he did note the need for a job that permits shifting positions at will from sitting, standing or walking. (R. at 487). Dr. Gynn opined that the claimant could perform repetitive grasping, twisting, turning and fine manipulation with the right arm for fifty percent of an eight-hour workday.[4] (R. at 488). The questionnaire indicates that August 8, 2001 is the earliest date that the symptoms and limitations in the questionnaire apply. (*Id.*).

On October 2, 2001, Dr. Frederic Renold completed a pulmonary residual functional capacity questionnaire. (R. at 501-504). Dr. Renold indicated that he treated Gilkey between 1993 and December 1996. (R. at 501). He noted various pulmonary symptoms,

---

[4] The form actually indicates fifty percent for the left arm and one hundred percent for the right arm. It is clear from the remainder of this record, however, that Dr. Gynn transposed the right and left arm on the form.

with a history of bronchial asthma, allergies and rhinitis.  (*Id.*).  Dr. Renold opined that Gilkey could walk only 1/4 a block without having to rest, that she could sit continuously for one hour and that she could stand continuously for fifteen minutes.  (R. at 502).  During an eight-hour workday, he opined that she could sit for about four hours and stand for less than two hours.  (R. at 503).  He further opined that she would need to take unscheduled breaks more than twice a day and would miss work more than three times a month as a result of her asthma.   (R. at 503-504).   The report indicates that the claimant can occasionally lift less than ten pounds and can never lift more than ten pounds.  (R. at 503).  Finally, Dr. Renold opined that the claimant should avoid all exposure to fumes, odors, dusts, gases and other pulmonary irritants, in addition to avoiding exposure to extremes of heat, cold, and humidity in the workplace.  (*Id.*).

**Claimant's Testimony**

Gilkey testified at the hearings held on June 30, 1998, September 13, 2001 and January 30, 2002.  (R. at 38, 533, 608).  She was born March 6, 1950.  (R. at 610).  She completed two years of college and was certified as a medical assistant.  (R. at 533-34).  She stands 5' 6" tall, weighing approximately 240 pounds and has been at this weight since the end of 1995.  (R. at 534).  She is right-handed.  (R. at 534).  Gilkey claims that she was disabled and unable to work prior to her date last insured ("DLI"), December 31, 1998 due to severe pain in her right arm.  She contends that the pain is a result of her modified right radical mastectomy, which led to right arm swelling, and upper extremity lymphedema.  (R. at 21, 29, 328).

**A.     June 30, 1998 Hearing**

At the June 30, 1998 hearing, Gilkey testified that she experiences severe swelling

and pain in her right arm from her hand to the top of her shoulder.  (R. at 616, 623).  She described the pain as an aching, throbbing pain which sometimes leaves her arm numb.  (R. at 618).  Gilkey testified that she experiences the pain practically every day.  (R. at 617).  She takes Tylenol and elevates her arm for relief.  (Id.).  Gilkey testified that for the past month or so, she could not do much with her right hand.  (R. at 618).  Gilkey said that she eats with her left hand, puts dishes in the dishwasher with her left hand and can use the microwave with her left hand.  (R. at 618, 621-22).  She seldom goes to the grocery store and her daughter comes to her house two days per week to help with the housework.  (R. at 620).  Gilkey's granddaughter also cleans and vacuums for her.  (R. at 621).  Gilkey claimed that she could only lift five pounds.  (R. at 623).

Gilkey also testified that her asthma causes shortness of breath that prevents her from walking more than fifty feet without having to rest.  (R. at 618-620).  She said she can only stand for about ten to fifteen minutes because of the shortness of breath.  (R. at 624).  Gilkey explained that her asthma is bad in humid weather and she cannot go outside when it is 30 degrees or below.  (R. at 619, 626.)  In February 1998, she suffered an asthma attack and was hospitalized.  (R. at 624).  Gilkey uses her inhaler, with Albuterol, on a daily basis.  (R. at 625).

Gilkey further testified that she had not worked at all since April 1996.  (R. 613).

**B.    September 13, 2001 Hearing**

At the September 13, 2001 hearing, Gilkey testified that she had not worked since May or June 1996.  (R. at 536).  She said that she had not done any part-time or full-time work of any type since that time.  (R. at 536).  Despite repeated references in the record to claimant working full or part-time, Gilkey denied that there were any periods of work at

all from 1997 through 2001.  (R. at 537-541).  She testified that the last time she worked was in 1996 for Ms. Cornell.  (R. at 541).

Gilkey began experiencing the pain in her right arm in 1996.  (R. at 535).  Gilkey said that she has to make her bed with her left hand.  (R. at 547).  Gilkey explained that on a normal day, she goes to church and reads.  (R. at 547, 550).  Her daughter does the housework and she does not go shopping unless someone is with her.  (R. at 567).  She occasionally visits with family and friends but brings pillows with her to elevate her arm.  (R. 547-48).  Gilkey can go about twenty to thirty minutes without pain before she has to elevate her right arm.  (R. 548-49).  Her arm has been like this since about 1994.  (R. at 549).  She testified that the pain has gotten worse in the past year.  (*Id*.).  Gilkey has worn a Jobst stocking from time to time to alleviate the pain since 1996.  (R. at 553.).  Gilkey described her pain as an aching, throbbing pain from her right wrist to her shoulder.  (R. at 559).

On November 11, 1998, Gilkey went to the hospital with a sharp pain in her right arm and was diagnosed with cellulitis.  (R. 557).  Prior to the cellulitis episode in 1998, she could lift fifteen pounds with her right hand.  (R. at 573).  After the Cellulitis episode, Gilkey was limited to lifting five pounds with her right hand.  (R. at 574).  She testified that she could currently lift about fifteen pounds with her left hand.  (*Id*., R. at 580).  In 2001, Gilkey could pick up a glass with her right hand but she could not write a letter with that hand.  (R. at 574).  Gilkey testified that prior to late 2000, she could pick up a coin with her right hand and turn a loose doorknob.  (R. at 576-77).  However, at that time, she could not write more than two lines, button or zip her clothing, or manipulate shower knobs with her right hand.  (R. at 575-576).  The last time she used her right hand to button or zip clothing, cook, dust,

sweep, mop or iron was prior to the 1998 cellulitis episode.  (R. at 576, 578, 579).

Gilkey testified that she has problems with both knees, but the left knee is worse than the right.  (R. at 550).  Gilkey said that she cannot squat, kneel, crouch, stoop or bend because of the pain in her knees.  (R. at 565-66).  Her knee problems began in 1995.  (R. at 551).  Gilkey testified that she can only sit for twenty minutes before having to get up and move around because of pain in her left knee.  (R. at 560-61).  She takes Aleve for the pain in her knees.  (R. at 561).  Gilkey testified that she had an upcoming appointment for an evaluation at Northwestern University's pain clinic.  (*Id.*).  When Gilkey walks around for relief from her knee pain, she is up for about fifteen to twenty minutes and then she lays down for three to four hours.  (R. at 562-63).  She reads when she lays down but can only do so for ten to fifteen minutes before pain interrupts her concentration and she needs to reposition herself.  (R. at 563).

In May of 1996, the last time she worked, she was constantly on her feet.  (R. at 541, 542-43).  Gilkey was working twelve hours a day in May of 1996 and would be standing and/or walking for at least one and one-half hours without sitting.  (R. at 543).  She was having difficulty working in May of 1996 so she cut back on the amount of hours she worked and limited her work schedule to two or three days per week.  (R. at 567-68).

Gilkey also testified that as a result of her asthma, she cannot walk a long block without having to stop and rest.  (R. at 554).  She said that stress can trigger her asthma symptoms.  (*Id.*).  Gilkey testified that she went to the emergency room for her asthma in July 2000. (R. at 578).

### C.    January 30, 2002 Hearing

At the January 30, 2002 hearing, Gilkey testified that she has had excruciating pain

in her right arm since 1996.  (R. at 42).  She described the pain as a continuous throbbing ache.  (*Id*.).  Gilkey said that before the cellulitis episode in 1998, she experienced this pain every other day.  (R. at 43).  Since 1998, she has daily episodes of pain on and off throughout each day.  (R. at 44).  Gilkey indicated that out of a twelve hour period of time, she is not in pain for only for two or three hours. (R. at 58).

Gilkey testified that her current activities were basically the same as she described at the previous hearing.  (R. at 46).  She said that she never goes grocery shopping by herself because of the pain in her left knee.  (R. at 64).  Gilkey does arm exercises three times a day and has been doing them since 2001.  (R. at 50).  She testified that she gets short of breath if she walks more than a block because of her asthma.  (*Id*.).  However, Gilkey also said that she goes for walks every so often and can walk less than a half of a mile.  (R. at 48).  Gilkey uses her inhaler every day and takes Claritin.  (R. at 51-52).

Gilkey testified that she can only stand for ten minutes or less because the edema in her right arm causes it to feel like it weighs 150 pounds.  (R. at 52).  She testified that she should not have been lifting fifteen to twenty-five pounds in May 1996.  (R. at 53).  Gilkey said that she was first limited to lifting five pounds with the right hand in 1995 or 1996.  (*Id*.).  Gilkey indicated that she still has to elevate her arm after about thirty minutes for one to two hours.  (R. at 54, 74).  She claimed that this has been going on for seven or eight years.  (*Id*.).  Gilkey also testified that for the past three or four years, she has been wearing the Jobst stocking all day, every day.  (R. at 57).  However, she still has pain when she wears the stocking.  (R. at 86).

Gilkey explained that when she is not in pain, for two to three hours a day, she can use her right hand to button and zip clothing, to pick up a coin or to write for about ten to

fifteen minutes.  (R. at 58, 66).  Gilkey testified that when she does things with her right hand, like drive or pick something up from a table, the pain starts immediately.  (R. at 61).  She testified that she cannot use a keyboard but she can reach up and grab a glass if she is not having pain.  (R. at 68).

Gilkey further testified that she has the same problems with her knees as she previously described.  (R. at 51).  She has swelling in her left knee after she is on her feet for forty to forty-five minutes.  (R. at 62).  Gilkey elevates her leg to ease the swelling.  (R. at 63).  Gilkey's medications include: Celebrex, Lasix, Vasotec, occasional Predisone, Claritin D and Aleve.  (R. at 59-60).

**Medical Expert's Testimony**

Dr. Ashok Jilhewar testified as the medical expert ("ME") at the hearings held on September 13, 2001 and January 30, 2002.  (R. at 69, 581).  Dr. Jilhewar testified that Gilkey suffers from lymphedema secondary to mastectomy, asthma, hypertension with no evidence of organ damage, obesity and mild degenerative joint disease.  (R. at 585, 588-89).  He testified that Gilkey's degenerative joint disease does not meet or equal a listing-level impairment.[5]  (R. at 589).  Dr. Jilhewar further testified that there is no listing for lymphedema, but that it would severely reduce the rest of the functional capacity while a person with lymphedema uses the right upper extremity.  (R. at 589).  Dr. Jilhewar agreed that Gilkey's need to elevate her arm at or above heart level is consistent with her condition.  (R. at 586).  He also stated that aching pain is expected and consistent with Gilkey's condition because of the swelling in her arm.  (R. 588, 597).

---

[5] A listing-level impairment is an impairment that the Commissioner considers conclusively disabling under section 1.03 of 20 C.F.R. Subpart P, Appendix 1.

Dr. Jilhewar noted that he could not understand Gilkey's claims of excruciating pain in her right arm. (R. at 588, 597). However, he testified that she could have excruciating pain. (R. at 73-74). Dr. Jilhewar indicated that pain and swelling increase and decrease depending on how long the arm is in a position below the heart. (R. at 73). Dr. Jilhewar concluded that pain is subjective, varying from person to person, and that he could not say that Gilkey does not have pain to the extent that she claims. (R. at 87). He agreed that there is an underlying medical condition that could cause the type of pain Gilkey describes. (R. at 88). Dr. Jilhewar never thought Gilkey was malingering. (*Id.*).

Dr. Jilhewar opined that Gilkey should have a three pound occasional lifting limitation relative to the right hand and twenty pound occasional lifting limitation relative to the left hand. (R. at 496-499, 590). He opined that Gilkey should have a three pound frequent lifting limitation as to the right hand and a ten pound frequent lifting limitation as to the left hand. (R. at 496, 590). Dr. Jilhewar noted no significant limitation as to handling and feeling but indicated that Gilkey would be limited in pushing and pulling. (R. at 75, 497). According to Dr. Jilhewar, standing and walking would be limited to a total of four hours maximum and thirty minutes continuous. (R. at 496, 590). He opined that for the time period preceding Gilkey's cellulitis episode, May 1996 through November 1998, the standing and walking limitations would be increased to six hours in an eight-hour workday. (R. at 498, 591). His opinion in this regard is based on Dr. Epner's October 4, 1996 knee examination which showed normal results, and the progression of Gilkey's degenerative joint disease since that time. (R. at 593-94).

Dr. Jilhewar indicated that Gilkey could use her right arm during the course of a work day to lift up to three pounds occasionally and frequently. (R. at 597). He said that she

could "use the fingers to support whatever will go up to three pounds." (*Id.*). Dr. Jilhewar further testified that Gilkey could "use her right arm to lift three pounds .... when there is no swelling." (R. at 598). Dr. Jilhewar explained that the use of Gilkey's right arm needs to be at a slower pace than what is normal, it needs to be limited to 90 degrees and that she cannot lift the right arm above her shoulder. (R. at 497, 598). He testified that the use of her right arm will cause Gilkey aching and discomfort. (R. at 599).

Dr. Jilhewar further opined that based on her lymphedema, Gilkey needs the freedom to keep her right arm elevated to the heart level or above at all times. (R. at 76-77, 497, 599, 602). He indicated that some of his patients use a sling to keep the arm elevated during the day. (R. at 602). Dr. Jilhewar testified that proper use of the Jobst stocking should decrease a patient's pain and swelling. (R. at 79). However, Dr. Jilhewar also said that if a patient told him that she was still uncomfortable, had swelling and needed to elevate her arm even with proper use of the stocking, he could not argue with that. (R. at 80). Furthermore, Dr. Jilhewar testified that it would be difficult for Gilkey to use her right arm while she was elevating it. (R. at 88).

Dr. Jilhewar also agreed with Dr. Gynn's July 8, 1998 residual functional capacity assessment, in which he concluded that Gilkey was limited to twenty-five percent repetitive grasping and twisting, fifty percent repetitive fine manipulation, and twenty-five percent repetitive reaching with the right hand/fingers/arm out of an eight-hour workday. (R. at 82, 358).

Finally, Dr. Jilhewar testified that his capacity assessment with respect to Gilkey's asthma had not changed because there is no pulmonary function test by a treating physician. (R. at 84-85).

**Vocational Expert's Testimony**

At the January 30, 2002 hearing, James Radke, a certified rehabilitation counselor, testified as the vocational expert ("VE"). (R. at 90). Radke testified that Gilkey's most recent past relevant work was as a medical assistant. (R. at 93). He indicated that the medical assistant job was a light and skilled job, and was medium as performed. (R. at 93.)

The ALJ presented Radke with the following hypothetical person: a female individual who is between the ages of 46 and 52 years of age, has a high school education and is certified as a medical assistant. (R. at 91). The hypothetical person can lift and carry no more than twenty pounds occasionally and ten pounds frequently. (*Id.*). The hypothetical person can also sit, stand and walk with normal breaks for up to six hours each in an eight-hour day. (*Id.*). The hypothetical person may not climb ladders, ropes or scaffolds but may otherwise climb ramps and stairs, balance, stoop, kneel, crouch and crawl no more than occasionally. (*Id.*). The hypothetical person must avoid concentrated exposure to fumes, odors, dusts, gases and other pulmonary irritants, in addition to avoiding exposure to extremes of heat, cold, humidity or wetness in the workplace. (*Id.*). The hypothetical person must avoid exposure to hazards such as unprotected heights or excavations, or dangerous machinery. (*Id.*). Finally, the hypothetical person may not perform work with the dominant right arm at a level above the shoulder. (R. at 91-92).

Based on the ALJ's hypothetical, the VE opined that such a person could work as a medical assistant as that work is normally performed. (R. at 95). Radke further opined that interviewing skills involved with the medical assistant job would be transferrable to the sedentary level. (R. at 95-96). Based on the ALJ's hypothetical, the VE testified that there

are approximately 5,000 medical office positions and 1,000 medical billing clerk positions available in the region at the sedentary level.  (R. at 97).

ALJ Karmgard then asked the VE to assume that the hypothetical individual cannot perform work with the dominant right hand, arm or fingers that requires repetitive grasping, repetitive fine manipulation, or repetitive reaching overhead for more than fifty percent of an eight-hour workday.  (R. at 97).  Radke testified that this additional limitation would eliminate Gilkey's past relevant work as well as the transferrable jobs he had just mentioned.  (R. at 98).  However, he also testified that light and sedentary unskilled work could be performed with the limitations given in the first two hypotheticals.  (*Id*.).  The VE indicated that there are 1,200 meter reading positions, 1,500 cashier positions, 7,700 taxi driver positions, 2,900 parking lot attendant positions, 3,600 library clerk positions, 1,300 private security positions, and 6,300 apparel sales positions available in the region at the light unskilled work level.  (R. at 98-101).  He also indicated that there are 700 information clerk positions, 5,000 receptionist positions, and 850 cashier positions available in the region at the sedentary unskilled work level.  (R. at 98, 101).

Radke testified that it would not affect the hypothetical person's ability to perform the jobs listed if that individual had to wear a compression device, like a stocking, on the right upper extremity.  (R. at 102).  The VE indicated that the parking lot attendant and taxi driver positions would be eliminated if the individual could not bilaterally perform work requiring operation of foot pedals or foot controls.  (R. at 102).

Next, the ALJ asked Radke to assume that lifting and carrying were limited to ten pounds on an occasional basis and lighter items such as small hand tools or individual case files no more than frequently.  (*Id*.).  The VE testified that this limitation would eliminate all

17

of the light jobs that were previously indicated and only 850 cashier positions, 700 information clerk positions, 5,000 receptionist positions, and 1,000 medical billing clerk positions would be available in the region. (*Id.*).

The ALJ then asked the VE to assume that the individual cannot not perform work which requires repetitive grasping, twisting or repetitive reaching with the right hand, including overhead, for more than twenty-five percent of the workday. (R. at 103). Radke testified that this limitation would eliminate the medical billing clerk positions, the information clerk positions and the cashier positions. (*Id.*). The receptionist position would be reduced to less than 500 jobs in the region. (*Id.*).

The ALJ asked Radke to further assume that the individual has no effective use of the right upper extremity. (R. at 105). Radke testified that this limitation would eliminate all of the light and sedentary jobs he described and the prior work as a medical assistant. (*Id.*).

Next, the ALJ asked Radke to consider all of the jobs that had been discussed and presented him with a new hypothetical. (*Id.*). The ALJ asked the VE to assume the following: the individual can lift three pounds with the right hand and up to twenty pounds with the left hand on an occasional basis and three pounds with the right hand and ten pounds with the left hand on a frequent basis. (R. at 105-06). The individual can stand and walk for up to a combined total of four hours in an eight-hour day, and for no more than thirty minutes continuously at any one time. (R. at 106). The individual cannot climb ladders, ropes and scaffolds, but can climb ramps and stairs occasionally. (*Id.*). The individual cannot crouch, but can balance, stoop, kneel and crawl occasionally. (*Id.*). Further, the individual has limitations on pushing, pulling, and reaching with the right upper

18

extremity to the extent it can be done only at a slower pace, and the individual cannot work above the shoulder level with the right upper extremity. (R. at 107). The hypothetical individual must avoid concentrated exposure to fumes, odors, dusts, gases and other pulmonary irritants, in addition to avoiding exposure to extremes of heat, cold, humidity or wetness in the workplace. (*Id.*). Finally, the individual needs to elevate the right upper extremity to the level of the heart at intervals of thirty minutes for ten minutes at a time. (*Id.*).

Based on the ALJ's hypothetical, the VE testified that the individual could not perform her prior work without significant accommodations. (R. at 107). Radke further testified that such an individual could perform the light work positions of parking lot attendant and library clerk. (R. at 108). Such an individual could also perform the sedentary work positions of cashier, information clerk, medical billing clerk and receptionist. (*Id.*). Assuming that the individual could stand or walk for a total of six hours in an eight-hour day without interruption for thirty minutes continuously, the same light and sedentary positions would be available. (R. at 108-109).

The VE further testified that the sedentary jobs would be eliminated if the individual could not use the right upper extremity for any purpose during the ten minutes the individual was elevating the right upper extremity. (R. at 111). He also testified that if the individual could still perform some functions while the arm was elevated, the jobs would not be eliminated. (R. at 111). Additionally, Radke testified that it would be unacceptable to take unscheduled breaks when working at a public-intensive job, such as a cashier, receptionist, information clerk or apparel sales. (R. at 112-113).

The VE confirmed that the jobs he identified were within the characteristics of those

19

types of jobs as set forth in the Dictionary of Occupational Titles ("DOT"). (R. at 109).

## LEGAL ANALYSIS

### I. Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chafer*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.* While the ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate [his] assessment of the evidence to 'assure us that the ALJ considered the important evidence...[and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler*, 766 F. 2d 284, 287 (7th Cir. 1985)).

### II. Analysis Under the Social Security Act

To be entitled to either disability insurance benefits or supplemental security income

payments under the Social Security Act, the claimant must establish that she is under a disability.[6] A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).

In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling ("a listing-level impairment"), (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five step analysis. At step one, the ALJ found that Gilkey was not engaged in substantial gainful activity and had not been engaged in substantial gainful activity since May 15, 1996. (R. at 20, 29). At step two, the ALJ found that Gilkey's impairments, including a history of breast cancer status post modified right radical

---

[6] In order to receive disability insurance benefits under §§ 216(i) and 223 of the Act (title II), the claimant must establish that she was disabled on or before her date last insured ("DLI"), December 31, 1998.

mastectomy, swelling of the right upper extremity secondary to edema, lymphedema, asthma, and osteoarthritis of the knees, met the definition of "severe" for purposes of the analysis. (R. at 20, 29). At step three, the ALJ found that although claimant's ailments were severe, they did not equal any impairment that the Commissioner considered conclusively disabling. (R. at 20, 29). Therefore, the ALJ moved on to step four to determine whether Gilkey could perform her past relevant work.

At step four, the ALJ found that Gilkey had the residual functional capacity ("RFC") to perform a limited range of light and sedentary work between May 15, 1996, the alleged onset date, and November 10, 1998. (R. at 28-29). The ALJ further found that the claimant had the RFC to perform a limited range of sedentary work between November 11, 1998, the date of Gilkey's cellulitis episode, and March 5, 2000. (R. at 28-29). The ALJ concluded that Gilkey could not perform any past relevant work, because even her least demanding past relevant job required her to perform work activities inconsistent with the RFC assessments for the entire period since the alleged onset date. (R. at 27).

At step five, the ALJ found that, based on the RFC limitations in force from May 15, 1996 through November 10, 1998, there are a significant number of light and sedentary jobs in the region that the claimant could perform. (R. at 28). The ALJ also found that, based on the RFC limitations in force from November 11, 1998 through March 6, 2000, there are a significant number of sedentary jobs in the region that the claimant could perform. (R. at 28). The ALJ held that as of March 6, 2000, Medical-Vocational rule 201.14 applied and directed a finding of disabled. (R. at 29). Accordingly, the ALJ found that Gilkey was under a "disability" since March 6, 2000 but not prior thereto. (R. at 28).

Gilkey argues that the ALJ erred in not finding her disabled between May 15, 1996

and March 5, 2000.  Gilkey sets forth a number of arguments to support her contentions that: (1) the ALJ's RFC determination is not supported by substantial evidence, and (2) the ALJ's step five determination is not supported by substantial evidence.

## III.    The ALJ's RFC Determination Is Not Supported By Substantial Evidence Or Free From Legal Error

### A.    The ALJ Failed To Explain The Weight Given To Various Medical Opinions In The Record

Under the applicable regulations, the ALJ is required to explain the weight given to the opinions of claimant's treating physicians.  20 C.F.R. § 404.1527(d)(2) (stating that, "we will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").  Generally, the opinions of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be given great weight in disability determinations.  *Clifford*, 227 F.3d at 870.  If the ALJ does not give the treating physician's opinions controlling weight, he is required to explain the weight given to the opinions of State agency medical consultants or other program physicians.  20 C.F.R. § 404.1527(f)(2)(ii).

Here, the ALJ outlined the medical evidence, including: treatment records and two RFC questionnaires completed by Dr. Gynn, claimant's treating physician; a consultative examination report prepared by Dr. Epner; a consultative examination report and RFC assessment prepared by Dr. Hashimi; RFC assessments prepared by Dr. Donelan, Dr. Bone and Dr. Renold; and the testimony of and RFC assessments prepared by the ME, Dr. Jilhewar.  The ALJ specifically rejected Dr. Renold's October 2001 RFC assessment because he found that it was not supported by and not consistent with the overall record

23

of treatment and evaluations.[7]  (R. at 26).  The ALJ then discussed the ME's observations with respect to Dr. Hashimi's opinion.  In particular, the ME observed that Dr. Hashimi's finding of an inability to use the right upper extremity was a more restrictive limitation than those reported by claimant's treating sources and was not otherwise supported on an ongoing basis by the record.[8]  (R. at 27).  The ALJ found that the ME was a reliable witness and adopted, to a large extent, his RFC assessments.  (*Id.*).

However, the ALJ failed to explain why Dr. Gynn's opinions were not given controlling weight.  This is especially troubling because the ME agreed with some of Dr. Gynn's opinions, specifically with respect to grasping, fine manipulation and reaching, yet the ALJ's RFC determination included less restrictive limitations.  (R. at 83).  Indeed, the ALJ concluded that the claimant could perform repetitive grasping, fine manipulation and reaching with the right hand fifty percent of an eight-hour work day.  (R. at 21).  It is unclear how the ALJ came up with this limitation given Dr. Gynn's July 1998 conclusion that claimant could perform repetitive grasping and reaching with the right hand only twenty-five percent of an eight-hour work day.  (R. at 342).  In short, this Court has no idea why the ALJ discredited Dr. Gynn's opinions.[9]  Failure to provide good reasons for discrediting a

---

[7] Gilkey argues that the ALJ found that Dr. Gynn's opinion was not supported by and not consistent with the overall record of treatment and evaluations.  (R. at 26).  Even a cursory review of the opinion reveals that the ALJ is discussing Dr. Renold's opinion.  (R. at 26).

[8] To the contrary, Dr. Hashimi's finding is supported by the record.  Dr. Donelan and Dr. Bone both opined that Gilkey had no effective use of her right upper extremity.  (R. at 330-337).  Claimant also was advised in December 1998 to spare her right arm from any activity.  (R. 370).

[9] Gilkey also argues that Dr. Gynn's August 8, 2001 RFC questionnaire omitted information regarding limitations on sitting or standing, and that the ALJ should have obtained clarification from Dr. Gynn.  However, Dr. Gynn specifically stated that August 8, 2001 is the earliest date that the symptoms and limitations in that questionnaire apply.  Therefore, we find that his 2001 RFC assessment is irrelevant as it does not apply to the relevant time period.

treating physician's opinion is grounds for remand.  *See Clifford*, 227 F.3d at 870.

Furthermore, the ALJ failed to articulate the weight given to the opinions of Dr. Epner, Dr. Donelan and Dr. Bone.  Accordingly, remand is appropriate.  *Id.*; *see also, Lucio v. Barnhart*, 2004 U.S. Dist. LEXIS 12207, *40-42 (N.D. Ill. 2004) (finding that the ALJ erred because he failed to articulate the weight given to the treating physician's opinion nor did he explain the weight given to the opinions of the consultative examiner or the State agency physicians).  On remand, the ALJ must clarify the weight given to each of the medical opinions in the record.

### B.    The ALJ Failed To Address Portions Of The ME's Testimony

Gilkey argues that the ALJ failed to consider the ME's testimony in its entirety and selectively considered only the evidence that supported his denial of benefits prior to March 6, 2000.  An ALJ is not required to address every piece of testimony and evidence.  *Carroll v. Barnhart*, 291 F. Supp. 2d 783, 798 (N.D. Ill. 2003) (quoting *Stephens v. Heckler*, 766 F. 2d 284, 287 (7th Cir. 1985)).  However, an ALJ may not select and discuss only that evidence which favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the reviewing court to trace the path of his reasoning.  *Diaz*, 55 F.3d at 307.

Here, it is unclear whether the ALJ considered portions of the ME's testimony that were favorable to Gilkey's claim.  For instance, in discussing the need for elevation, the ALJ stated that, "the ME observed that the record of treatment contains no such specific limitation on any on-going basis, and that his reference thereto was based on the testimony of Ms. Gilkey."  (R. at 27).  However, Dr. Jilhewar also testified that his opinion that Gilkey needed the freedom to elevate her arm was based on the presence of lymphedema.  (R.

25

at 76).  Furthermore, the ME testified that the claimant's need to elevate her arm for thirty minute intervals is consistent with her condition.  (R. at 77-78).  Dr. Jilhewar also testified that Gilkey would need the freedom to keep her arm elevated at all times and that it would be difficult for her to actively use her arm while elevating it.  (R. at 88, 601-02).  The ALJ's opinion does not mention any of this testimony.

Next, the ALJ referenced Dr. Jilhewar's testimony that use of a Jobst stocking at the proper pressure would essentially eliminate any need to elevate the right upper extremity. (R. at 27).  However, the ALJ failed to note the ME's testimony that if a patient told him that she was still uncomfortable, had swelling and needed to elevate her arm even with proper use of the Jobst stocking, he could not argue with that.  (R. at 80).

Finally, with respect to the issue of pain, the ALJ noted that the ME had not observed patients who complained of excruciating pain.  (R. at 26).  However, it is unclear whether the ALJ considered the ME's testimony that pain is subjective, varying from person to person and that the claimant has an underlying medical condition that could cause the type of pain she described.  (R. at 88).

Because the ALJ failed to sufficiently articulate his assessment of the evidence to assure us that he considered the important evidence and to enable us to trace the path of his reasoning, remand is warranted.  *Carlson*, 999 F.2d at 181.

## C.    The ALJ's Credibility Determination Fails To Comply With SSR 96-7p

Gilkey also contends that the ALJ erred in his credibility determination.  This Court agrees.  An ALJ must comply with the requirements of Social Security Ruling 96-7p in evaluating the credibility of statements supporting a Social Security application.  *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).  Under SSR 96-7p, an ALJ must articulate

the reasons behind credibility evaluations:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Here, the ALJ outlined all of Gilkey's allegations and her testimony. (R. at 21-22). In the findings section of his opinion, the ALJ stated that "the claimant's complaints of disabling symptoms and limitations are considered credible to the extent and for the reasons set forth in the body of this decision." (R. at 29). However, after reviewing the opinion, it is unclear whether the ALJ found the claimant to lack credibility in general or whether he merely rejected some of her allegations of disabling symptoms and limitations. If the ALJ did reject some of Gilkey's allegations of disabling symptoms and limitations, he failed to articulate which ones he rejected or why he found those allegations to lack credibility.

For instance, the ALJ appears to have rejected Gilkey's claim that she cannot stand for more than ten minutes or walk for more than fifteen to twenty minutes because of the weight of her arm. His RFC determination indicates that she can stand and/or walk for a combined four hours in an eight-hour day, and for no more than thirty minutes continuously. (R. at 20). However, the ALJ never specifically stated that he found Gilkey's allegations in this regard to lack credibility, nor did he explain why he found the allegations to lack credibility. It is also unclear whether the ALJ found Gilkey's allegations with respect to her daily activities or her allegations of pain to be credible.

Because the ALJ failed to comply with the requirements of SSR 96-7p, the ALJ's credibility determination cannot stand. *See Brindisi*, 315 F.3d at 788. On remand, the ALJ must clarify his credibility finding and set forth specific reasons for that finding in accordance with SSR 96-7p.

### D. The ALJ Did Not Substitute His Own Judgment For That Of A Medical Professional

Gilkey next argues that the ALJ substituted his own judgment for that of a medical professional in finding that there was no significant ongoing reference to asthma symptoms other than Dr. Renold's October 2001 report. (R. at 26). Contrary to claimant's suggestion, the record does not support significant ongoing reference to asthma symptoms. Indeed, most of the records claimant references are dated between 1991 and 1993, well before the relevant time period. (R. at 284, 289, 425). Furthermore, Dr. Epner's report merely recites that the claimant reported that she experienced between one and five asthma attacks per month. (R. at 323). There is nothing in the record to support this claim. Additionally, Dr. Jilhewar testified that there was not adequate documentation to make a statement with regard to asthma. (R. at 70). He also noted that there was no pulmonary function test. (R. at 84). Based on the foregoing, the Court finds that the ALJ did not substitute his own judgment for that of a medical professional. Accordingly, we will not remand on this basis.

### IV. The ALJ's Step Five Determination

Because remand is necessary for further consideration of Gilkey's RFC, we need not address whether the ALJ's finding at step five is supported by substantial evidence. *Herron v. Barnhart*, 2003 U.S. Dist. LEXIS 15176, *36 (N.D. Ill. 2003). Nevertheless, the

Court is concerned with certain aspects of the VE's testimony and the ALJ's determination at step five. In particular, Gilkey argues that some of the jobs identified by the VE require a skill level that exceeds her abilities. The VE testified that the claimant has no skills from her past relevant work that would transfer to other occupations within her RFC. (R. at 95-98). He further testified that the jobs he identified were light or sedentary and unskilled. (R. at 98-101). However, the library clerk positions have a specific vocational preparation time ("SVP") of 3, and the billing clerk positions have an SVP of 4. (R. at 202). These jobs correspond to semi-skilled work. SSR 00-4p; *See* 20 C.F.R. 404.1568 and 416.968. On remand, the ALJ should clarify whether the claimant is capable of semi-skilled work despite the fact that she has no transferrable skills.

## CONCLUSION

For the reasons set forth above, Gilkey's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

**ENTER:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: January 18, 2006**

29